IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RAQUIAL A. HARRIS, | ) | CASE NO. 3:15CV927 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Raquial Harris ("Harris") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 13.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

**I. Procedural History**

On January 19, 2012, Harris protectively filed an application for SSI, alleging a disability onset date of August 31, 2011.  Tr. 14, 171.  She alleged disability based on the following: depression, anxiety, abdomen surgery in 2003 for bowel obstruction, and vision problems seeing up close: "it hurts to see."  Tr. 202.  After denials by the state agency initially (Tr. 68) and on reconsideration (Tr. 80), Harris requested an administrative hearing.  Tr. 96.  A hearing was held before Administrative Law Judge ("ALJ") Kim L. Bright on November 14, 2013.  Tr. 31-56.  In her January 16, 2014, decision (Tr. 14-25), the ALJ determined that there are jobs that exist in

significant numbers in the national economy that Harris can perform, i.e., she is not disabled. Tr. 24. Harris requested review of the ALJ's decision by the Appeals Council (Tr. 8) and, on March 24, 2015, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Harris was born in 1972 and was 39 years old on the date her application was filed. Tr. 24. She previously worked as a home health aide and at a fast food restaurant. Tr. 44-45. The highest grade she completed was seventh grade. Tr. 37.

### B. Relevant Medical Evidence[1]

On March 1, 2011, Harris sought mental health treatment from the Unison Behavioral Health facility ("Unison"). Tr. 346-354. She reported being depressed and anxious for the past ten years. Tr. 350-351. She also complained of inattention, sleep problems, psychological stressors, and alcohol and drug dependency. Tr. 351. Harris was diagnosed with depressive disorder NOS and assigned a global assessment of functioning ("GAF")[2] score of 55. Tr. 353.

On April 28, 2011, Harris saw Unison psychiatrist Sreekanth Indurti, M.D., for a psychiatric evaluation. Tr. 334-335. She was tearful and crying and complained of anxiety, panic attacks, lack of sleep and insomnia. Tr. 334. She also stated she felt sad, hopeless, useless and worthless, and that she lacked energy, appetite, and interest in doing things. Tr. 334. She denied any suicidal or homicidal thoughts, but reported occasionally hearing voices. Tr. 334.

---

[1] Harris only challenges the ALJ's decision with respect to her mental impairments. *See* Doc. 15. Accordingly, only the medical evidence relating to Harris's mental impairments is summarized herein.

[2] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id*.

She stated that she had been "depressed for a long time" but that she was never in treatment. Tr. 334. Upon examination, Dr. Indurti observed that Harris was cooperative, made fair eye contact, had average intelligence, was oriented to time, place, and person, had normal memory, and had adequate attention, concentration, insight, and judgment. Tr. 334. He diagnosed her with schizoaffective disorder, current episode depressed; assigned her a GAF score of 45 to 50;[3] and prescribed medication, including Abilify, Lexapro, Buspar and Trazodone. Tr. 335.

On October 10, 2011, Harris told Dr. Indurti that her medications were helping her. Tr. 326. She denied medication side effects and related that she was out of one of her medications. Tr. 326. Her depression was better and she was not hearing voices that threatened her, although she did have occasional panic attacks. Tr. 326. Upon exam, Harris was cooperative, made fair eye contact, had an appropriate affect and normal thought processes and content, was oriented to time, place, and person, had normal memory and adequate attention, concentration, insight and judgment. Tr. 326. Dr. Indurti continued her medication regimen. Tr. 326.

On November 7, 2011, Harris told Dr. Indurti that she was doing well and denied any hallucinations or delusions. Tr. 327. Her medications were helping her. Tr. 327. Dr. Indurti's findings remained unchanged from Harris' prior visit and he continued her medication regimen. Tr. 327.

On January 18, 2012, Harris saw Dr. Indurti and reported that she was feeling depressed, sad and tearful. Tr. 328. Dr. Indurti observed that her mood was sad and depressed. Tr. 330. Otherwise, she was cooperative, made fair eye contact, had an appropriate affect, normal thought processes, was oriented to time, place, and person, had normal memory and adequate attention,

---

[3] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." DSM-IV-TR, at 34.

3

concentration, insight and judgment. Tr. 330. Dr. Indurti continued her medications and added Viibryd. Tr. 329.

On February 16, 2012, Harris reported "having a lot of auditory hallucinations which are mean to her." Tr. 332. Upon examination, she was mostly normal except for a dysphoric mood and affect. Tr. 332. Dr. Indurti started Harris on Fanapt. Tr. 331. On February 23, 2012, Harris complained of physical side effects from the Fanapt, which she then stopped taking. Tr. 333. She denied hallucinations, her depression was better, and "she is able to maintain herself." Tr. 333. Upon examination, Harris was cooperative, made fair eye contact, appeared to be euthymic, had an appropriate affect, normal thought processes and content, was oriented to time, place, and person, had normal memory and adequate attention, concentration, insight and judgment. Tr. 333.

On March 27, 2012, Harris denied any hallucinations or delusions; she also reported that she heard voices and felt depressed when she woke up but that she got better as the day progressed and was able to maintain herself well. Tr. 344. Dr. Indurti's examination findings were unchanged from the prior month. Tr. 333.

On April 16, 2012, Harris saw a Unison nurse for a mental health follow-up. Tr. 412. She advised that her anxiety medication was working "really well" and her antidepressant helped her sleep 7-8 hours. Tr. 412. Upon examination, Harris had a stable mood, appropriate affect, organized thought process, was oriented in all spheres, and was cooperative. Tr. 412. She was tearful but calmed easily. Tr. 412.

On May 23, 2012, Harris saw Dr. Indurti for a medical management visit. Tr. 357. Examination findings revealed no abnormalities and Dr. Indurti assigned Harris a GAF score of

4

52. Tr. 357. He also changed Plaintiff's diagnoses to depressive disorder NOS, generalized anxiety disorder, and unspecified cocaine and alcohol dependence. Tr. 357.

On June 20, 2012, Harris reported to a nurse at Unison that her favorite uncle had died that day and that she felt more depressed, anxious and paranoid. Tr. 414-415. She stated that she did not like to leave her house. Tr. 414. Upon examination, she was pleasant, relaxed and cooperative and had good eye contact. Tr. 414. She denied hallucinations. Tr. 414. On July 18, 2012, Harris told the nurse that she was "talking to herself more and more. 'I can't help not answering the voices back. I don't like people telling me I'm crazy. I can't be around people.'" Tr. 416. She was crying during her appointment. Her mood was depressed, she was anxious and irritable, and her thought content was racing. Tr. 414. Her hygiene was good and she was well-groomed and dressed appropriately. Tr. 414. Her memory was intact and she was oriented to time, place, person, and events. Tr. 416. She was easily distracted. Tr. 416. The nurse added Latuda to her medications. Tr. 416.

On August 22, 2012, Harris saw Dr. Indurti for a medication management visit. Tr. 358. She denied delusions and hallucinations and had normal examination findings. Tr. 358. Dr. Indurti assigned her a GAF score of 52. Tr. 358. On September 20, 2012, Harris returned to Dr. Indurti for a medication management visit. Tr. 418. She denied hallucinations and her examination findings were again normal, except that her mood was sad. Tr. 418. Dr. Indurti changed her diagnosis to schizoaffective disorder bipolar type/depressive type, and assigned her a GAF score of 43. Tr. 418.

On October 15, 2012, Harris saw a Unison nurse and reported that she was feeling down, isolating more, and had increased depression. Tr. 419. She also requested to see a therapist. Tr. 419. Upon examination, Harris had a stable mood, appropriate affect and organized thought

process. Tr. 419. She was oriented in all spheres, cooperative, appropriately dressed, and she had good eye contact, hygiene, and intact memory. Tr. 419. She was easily distracted. Tr. 419. Tremors were observed in her hands. Tr. 419. The nurse referred her to a therapist. Tr. 419.

On October 25, 2012, Harris reported to a Unison nurse that she liked her medication regimen and that sometimes she just had bad days. Tr. 421. Upon examination, Harris had good hygiene, was dressed appropriately, and was alert and oriented in all spheres. Tr. 421.

On December 18, 2012, Harris saw Unison therapist Kenneth Teitlebaum, M.A. Tr. 408. She reported being more stable on her medications but that they make her sleepy. Tr. 408. She complained of auditory hallucinations. Tr. 408.

At a medication visit with a Unison nurse on January 24, 2013, Harris reported that she had been out of medication for four weeks and complained of depressive symptoms, insomnia, crying spells, high anxiety, and paranoia. Tr. 426. She denied hallucinations. Tr. 426. Harris saw Teitlebaum on January 28, 2013, and reported that she was sleeping too much. Tr. 409. She was alert and pleasant, and had a normal mood and appropriate affect. Tr. 409. She stated that she was interested in taking parenting classes and that she had learned similar skills when she trained her dog. Tr. 409. Teitlebaum located parenting classes and provided Harris with a phone number to call. Tr. 409.

On January 30, 2013, Harris saw Dr. Indurti for a medication management visit. Tr. 428. Upon examination, Harris was alert, oriented, and cooperative; had normal psychomotor activity; exhibited an "okay" mood; had a congruent, full range affect; had intact memory, attention, concentration; linear thought; no delusions or hallucinations; and fair insight and judgment. Tr. 428. He assigned her a GAF score of 43. Tr. 428.

6

On February 27, 2013, Harris saw a Unison nurse and reported that she was taking her medications as prescribed and that they were helping and that she was sleeping well. Tr. 429. She reported hearing non-commanding voices that were pleasant and not stressful or degrading. Tr. 429. Upon examination, Harris's mood was depressed but controlled. Tr. 429.

On March 5, 2013, at a visit with Teitlebaum, Harris's mood was despondent; she reported feeling guilty for not stopping her friend from drinking himself to death. Tr. 410. She reported that she did sign up for parenting classes and that she was taking care of children. Tr. 410. She was isolating but was still able to do household chores like changing her bed linen and doing laundry. Tr. 410. Teitlebaum "challenged her thinking that she had to lay in bed all day because she wasn't motivated to get up. She can motivate herself if she wants to." Tr. 410. He encouraged her to do normal activities. Tr. 410.

On May 3, 2013, Harris reported to a Unison nurse that she had experienced some thoughts of harming herself "without intentions" the previous day. Tr. 433. She denied current thoughts of harming herself. Tr. 433. Upon examination, Harris was mostly normal and presented with good hygiene and denied hallucinations, although she was easily distracted and had poor eye contact. Tr. 433. She spoke about planning to go to church that upcoming Sunday. Tr. 433.

On May 6, 2012, Harris saw a Unison nurse, who noted that Harris was tearful and felt hopeless about her future. Tr. 390. On May 20, 2013, she complained of still feeling down but sleeping better. Tr. 392. She heard voices at night. Tr. 392. Upon examination, Harris's mood was stable and other mental status findings were mostly normal. Tr. 392. The nurse referred Harris to the Genesis facility for additional therapy. Tr. 392.

7

On July 8, 2013, Harris told Teitlebaum that, through Genesis, she discovered how she was made to dislike herself and how to counter this. Tr. 387. She was "much happier without anyone in her life and is focusing on self[-]care now." Tr. 387. Her cousin was staying in her apartment with her at night. Tr. 387. On August 14, 2013, Harris reported that she was isolating and hated her apartment. Tr. 388. After receiving upsetting news, she attempted to overdose on her medication; she slept for two days but "woke up OK" and stated that she would not do it again. Tr. 388. On September 25, 2013, Harris was depressed and anxious. Tr. 389. She was also pleasant, oriented, had good thought content and eye contact, was well-groomed, and had good hygiene. Tr. 389.

### C. Medical Opinion Evidence

#### 1. Treating Source Opinion

In September 2012, Dr. Indurti completed a check-box mental functional capacity assessment on behalf of Harris. Tr. 360. He opined that Harris was markedly limited in all areas assessed, including the following abilities: understand, remember, and carry out very short and simple instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; make simple work related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with general public; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. Tr. 360. Dr. Indurti indicated that Harris was unemployable and that the limitations were expected to last twelve months or more. Tr. 360.

8

On May 6, 2013, Dr. Indurti completed a medical source statement on behalf of Harris. Tr. 435-437. Dr. Indurti opined that, for two-thirds of an eight-hour workday, Harris could remember, understand, and follow directions and maintain attention and concentration; she would be more than twenty-five percent less productive than an unimpaired worker in her ability to perform work at a reasonable pace; she is unable to consistently interact appropriately with the public and would be distracted by or distract coworkers more than one third of the time; she would be absent, late, or leave work early more than three times a month; and she would have emotional outbursts directed at coworkers or supervisors more than once every other month. Tr. 435-436. She could not withstand the stress and pressures of routine, simple, unskilled work because such work would likely cause her to decompensate and she would likely be successful only in a sheltered environment. Tr. 437. In his only comment provided, Dr. Indurti stated that Harris had hallucinations and delusions of persecution. Tr. 437.

### 2. State Agency Reviewers

On March 19, 2012, state agency psychologist Mel Zwissler, Ph.D., reviewed Harris's record. Tr. 62-65. Regarding Harris's mental residual functional capacity ("RFC"), Dr. Zwissler opined that Harris's symptoms from her diagnosis of schizophrenic, paranoid, and other psychotic disorders resulted in moderate limitations in her abilities to complete a normal workday and workweek and to perform at a consistent pace without an unreasonable number of rest periods. Tr. 62-64. As a result, Harris could perform tasks that do not have strict time or production requirements. Tr. 64. Dr. Zwissler found Harris to be moderately limited in her ability to get along with coworkers or peers without distracting them and that she could perform tasks that require occasional, superficial interaction with others. Tr. 64-65. She was moderately

9

limited in her ability to respond appropriately to changes in the work setting and would do best in an environment that was relatively static with few changes.  Tr. 65.

On August 27, 2012, state agency psychologist Karla Voyten, Ph.D., reviewed Harris's record and affirmed Dr. Zwissler's findings.  Tr. 73-76.

### D. Testimonial Evidence

#### 1. Harris's Testimony

Harris was represented by counsel and testified at the administrative hearing.  Tr. 32-51. She is single and lives alone in an apartment.  Tr. 36-37.  She has a car and a driver's license and drives four or five times a week when she needs to go to the store or do laundry.  Tr. 37.  She does not drive at night because she gets nervous and because of her vision.  Tr. 37.  She walked to the hearing; it took her about twenty minutes.  Tr. 37.  She has gained thirty pounds in the last year because she began to eat better and is getting more sleep.  Tr. 36.

After Harris dropped out of school, she attended Job Corps and attempted to train for a trade but she could not keep up and had to drop out.  Tr. 38.  She went to nursing school and "the lady, she let me pass anyway" but she was unable to get her STNA (State Tested Nursing Assistant) certification despite three attempts.  Tr. 39.  She worked as a home health aide for about eight months and then she was laid off when "they found some reliable workers."  Tr. 40. She then quit because they would not give her any more hours.  Tr. 40.  She also worked in fast food for a short time but quit when she could not keep up.  Tr. 40-41.

In a typical day, Harris gets up around 10 or 11 o'clock and gets something to eat.  Tr. 41. She takes her medication, which makes her tired, and then she goes back to sleep.  Tr. 41. When she gets up again she "might straighten up a little bit."  Tr. 41.  She does not leave the house much because she does not have any friends.  Tr. 41.  She goes to doctor appointments and

a family member might come over to take her somewhere or visit with her. Tr. 41. Her sister has children and she sometimes goes out with them; sometimes her brother-in-law will pick her up and take her to their house. Tr. 41. Sometimes she does not get dressed or comb her hair and stays in bed all day. Tr. 42. She does this anywhere from two to five days a month. Tr. 37. She does not watch television; she explained that she is tired and not motivated to do much. Tr. 42. She stated, "Since I don't have any children, I guess I don't feel motivated to do anything." Tr. 47. She also explained that her medications make her sleepy. Tr. 44.

Harris testified that she is unable to work because, in every job she has had, people have told her that she cannot pay attention and that they do not have time to stand with her and show her what to do. Tr. 44. She described how she worked seasonally one year as a cashier at Sears. Tr. 46. Her cousin, a manager there, got her the job and no one knew she was having a hard time because her cousin helped her. Tr. 46-47. She stated that, when she learned new tasks at work, she understood when people first gave her instructions but that, as soon as they left, she would forget "one or two things" and have to find another person to ask. Tr. 50. Soon, all the people at work would comment that they had just shown her what to do and she would be told that she could not keep up. Tr. 50. People also complained that she was in her own world and not nice enough. Tr. 44. One person suggested she needed a job dealing only with one person. Tr. 44. When she worked as a home health aide for the elderly, the patients told her boss that they did not want Harris to come back; that they did not like her; and that she had an attitude. Tr. 44. Harris explained that she did not know she had an attitude and stated that she has tried to work but it keeps getting harder and harder the older she gets. Tr. 44-45. People have also told her she has "anger issues." Tr. 47.

Harris stated that her medications are "really good this time," including that her side effects are diminished. Tr. 48. She is not having mood swings as often on the Seroquel. Tr. 48. She gets upset "every once in a while" because she does not like being around people. Tr. 48. She does not get upset a lot like she used to when she was working. Tr. 48. She stated that her medication makes her feel a lot better than she did when she was trying to work and was not taking medication. Tr. 48. She also stated that she gets more sleep: "I used to—all my life, I feel like I only got two or three hours of sleep; now I get seven hours of sleep." Tr. 49. She can wake up after eight hours of sleep and go right back to sleep for another six hours, "if I want to, because that's what the medication does." Tr. 49. She has been hearing voices since she was a little girl, but they are eliminated when she takes her medication. Tr. 49.

### 2. Vocational Expert's Testimony

Vocational Expert Joe Thompson ("VE") testified at the hearing. Tr. 51-56. The ALJ asked the VE to determine whether a hypothetical individual of Harris's age, education and work experience could perform unskilled work if the individual had the following characteristics: can perform work at all exertional levels, can perform simple, routine tasks consistent with unskilled work in a static environment with few changes; can make simple work-related decisions with no strict production requirements; and can have occasional interaction with coworkers, supervisors, and the public. Tr. 53. The VE answered that such an individual could perform work as a dishwasher (10,000 Ohio jobs; 300,000 national jobs), janitor (20,000 Ohio jobs; 800,000 national jobs), and laundry worker (5,000 Ohio jobs; 200,000 national jobs). Tr. 53-54.

The ALJ asked the VE how long a typical worker would be expected to be on-task during a workday. Tr. 54. The VE replied that, in his experience, a typical worker would get two 15-minute scheduled breaks in the morning and afternoon, a 30-minute lunch break, and one or two

additional unscheduled 10-15 minute breaks; if a worker is off-task 20 percent of the time or more, there would be no jobs the worker could perform.  Tr. 54.  Next, the ALJ asked the VE how the individual's ability to sustain competitive employment would be affected if the individual required re-direction performing tasks.  Tr. 54.  The VE explained that, typically in unskilled positions, there would be occasional supervision provided but, if the individual required re-direction more frequently than that to the point where there would be consistent re-direction, there would be no jobs the individual could perform.  Tr. 54.  The ALJ asked what "occasional" meant and the VE answered that "occasional" meant up to one-third, or 30%, of the workday.  Tr. 54.  Lastly, the ALJ asked the VE what the standard in the workplace is regarding absences and the VE stated that, in his experience, if a person is consistently absent one to two days per month all employment would be eliminated.  Tr. 55.

Next, Harris's attorney asked the VE whether the hypothetical individual previously described would be affected in her ability to sustain work if the individual was also 25% less productive than an unimpaired worker.  Tr. 55.  The VE answered that, for the positions mentioned, there would be no set criteria for productivity.  Tr. 55.  However, if the limitation posed was akin to off-task time, the VE stated that it would be over 20% and, therefore, preclude all employment.  Tr. 55.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

---

[4] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her January 16, 2014, decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since January 19, 2012, the application date. Tr. 16.

2. The claimant has the following severe impairments: depression, anxiety, and schizoaffective disorder. Tr. 16.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 16.

4. The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant retains the ability to perform simple, routine tasks consistent with unskilled work in a static environment with few changes; able to make simple work related decisions; and only superficial interaction with others. Tr. 18.

5. The claimant was born on September 28, 1972 and was 39 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr. 24.

6. The claimant has a limited education and is able to communicate in English. Tr. 24.

7. Transferability of job skills is not an issue because the claimant does not have past relevant work. Tr. 24.

8. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 24.

9. The claimant has not been under a disability, as defined in the Social Security Act, since January 19, 2012, the date the application was filed. Tr. 25.

### V. Parties' Arguments

Harris objects to the ALJ's decision on two grounds. She argues that the ALJ erred with respect to the medical opinion evidence because she failed to give good reasons when assigning "less weight" to the opinions of Harris's treating physician, Dr. Indurti, and she failed to properly evaluate the state agency opinions. Doc. 15, pp. 9-15. In response, the Commissioner submits that the ALJ followed the proper procedure and that substantial evidence supports her evaluation of the medical opinion evidence. Doc. 19, pp. 9-16.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ gave good reasons for the weight she assigned to Dr. Indurti's opinions

The ALJ did not assign controlling weight to the opinions of Dr. Indurti, Harris's treating psychiatrist. Harris does not challenge this finding by the ALJ. Instead, Harris argues that, having found Dr. Indurti's opinions not entitled to controlling weight, the ALJ was required to provide good reasons for not assigning "significant" weight to the opinions and this she did not do. Doc. 15, p. 9.

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Here, the ALJ gave Dr. Indurti's opinions "less weight" *vis a vis* the "great weight" she assigned to the opinions of the state agency reviewers. Tr. 22. Harris argues that the ALJ committed error because, when assigning weight to Dr. Indurti's opinions, she did not consider all the factors contained in 20 C.F.R. § 416.927(c). Doc. 15, p. 12. She argues that the ALJ only considered the consistency of Dr. Indurti's opinions with the record as a whole and the supportability of his opinions[5] but did not discuss the length, nature, and extent of the treatment relationship. *Id*.

An ALJ is not required to discuss every factor in 20 C.F.R. § 416.927(c). *Francis v. Comm'r of Soc. Sec.*, 414 Fed. App'x 802, 804 (6th Cir. March 16, 2011) ("Although the

---

[5] Again, Harris does not dispute that the ALJ provided sufficient explanation as to how Dr. Indurti's opinions were inconsistent with the record as a whole and were unsupported. *See* Tr. pp. 22-23 (ALJ's decision explaining how Dr. Indurti's opinions are inconsistent with the record as a whole and not supported by his own treatment notes or his two check-box form opinions, which contained only one handwritten comment between them); 20 C.F.R. § 416.927(c) (the ALJ considers the consistency of the opinion with the record as a whole and the supportability of the opinion when discussing good reasons for assigning weight to an opinion).

17

regulations instruct an ALJ to consider [the length, nature, and extent of the treatment relationship], they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis."). Even assuming the ALJ was required to consider all the factors, her failure to follow this procedural rule is harmless error when, as here, the Court can engage in meaningful review of the ALJ's decision. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009) (an ALJ's failure to give good reasons for assigning less weight to a treating source opinion is harmless error where the court can engage in meaningful review of the ALJ's decision).

Moreover, the Court disagrees that the ALJ did not discuss all the factors found in 20 C.F.R. § 416.927(c). The only factors the ALJ did not expressly discuss in the paragraph of her decision assigning weight to Dr. Indurti's opinions were Dr. Indurti's specialization and the length, nature, and extent of his treatment relationship with Harris. However, elsewhere in her decision, the ALJ made clear that she considered those factors. In detailing Harris's treatment history in exhaustive detail, the ALJ described Dr. Indurti as a psychiatrist. Tr. 20 ("In April 2011, Psychiatrist Sreekanth Indurti, M.D., diagnosed the claimant..."). She also outlined Harris's treatment history in chronological order. She begins in March 2011 when Harris presented, for the first time, for mental health treatment and notes that, one month later, she began treatment with Dr. Indurti. Tr. 20. She states that Harris saw Dr. Indurti in October and November 2011 and discusses his treatment notes. Tr. 20. She observes that Harris continued to treat with Dr. Indurti "throughout 2012, meeting with him approximately one time each month for 30 minutes." Tr. 20. She goes on to discuss Dr. Indurti's treatment notes (and identifies them as Dr. Indurti's treatment notes) from March, April, May, August, and September 2012 and January 2013. Tr. 21. And the ALJ accurately dated Dr. Indurti's two opinions. Tr. 22

(referencing Dr. Indurti's "one handwritten comment" in his opinion, otherwise containing "check marks on pre-printed forms," completed in May 2013); Tr. 23 (discussing Dr. Indurti's "earlier" opinion, dated September 2012). In contrast to Harris's assertion (Doc. 21, p. 3), the ALJ clearly recognized that Harris treated with Dr. Indurti, a psychiatrist, once a month, for thirty minutes each month, for the better part of two years. The ALJ's failure to summarize the aforesaid in her paragraph assigning weight to Dr. Indurti's opinions does not render her decision non-compliant with the factors in 20 C.F.R. § 416.927(c).

In an unrelated argument, Harris complains about the ALJ's assertion that Harris's assigned GAF score of 45-50 would not preclude a claimant from having the mental capacity to hold at least some jobs in the national economy. Tr. 15, p. 13. She argues that the issue is not whether there are "some jobs" but whether there are "significant jobs." *Id*. However, the ALJ, relying on VE testimony, found that there are a significant number of jobs in the national economy that Harris can perform. Tr. 24 (listing dishwasher (10,000 Ohio jobs; 300,000 national jobs), janitor (20,000 Ohio jobs; 800,000 national jobs), and laundry worker (5,000 Ohio jobs; 200,000 national jobs). The ALJ's failure to use the word "significant" rather than "some" in a generalized statement about GAF scores is not error. Moreover, Harris concedes that an ALJ is not required to credit a GAF score. Doc. 21, p. 3.

### B. The ALJ did not err when evaluating the state agency reviewers' opinions

Harris argues that the ALJ erred when she assigned "great weight" to the state agency reviewers' opinions because she only listed one reason for doing so—that the "consultants have specialized knowledge in assessing medical findings within the Social Security standard." Doc. 15, p. 14 (quoting Tr. 22). The Court disagrees. The ALJ also explained that she found the severity of the symptoms reported by Harris not entirely credible, "as evidenced by treatment

19

records and reported activities," and that the record shows that Harris's mood improved with medication adjustments; i.e., the state agency reviewers' opinions were consistent with the record as a whole. Tr. 22. Harris's additional argument, that the ALJ improperly gave more weight to a reviewing source opinion than a treating source opinion, is also without merit. "In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." Soc. Sec. R. 96-6p, 1996 WL 374180, at *3 (July 2, 1996); *Price v. Comm'r of Soc. Sec.*, 342 Fed. App'x 172, 177 (August 18, 2009) ("Although the opinion of a treating physician generally is given more weight, this Court has recognized that consultative opinions may be credited where they are supported by the record.").

The ALJ did not run afoul of the regulations when assigning weight to the medical opinion evidence and her decision is supported by substantial evidence. Accordingly, her decision must be affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (a court must uphold the ALJ's decision if it is supported by substantial evidence).

## VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.

Dated: February 26, 2016

Kathleen B. Burke
United States Magistrate Judge